## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| **TENNESSEE HOSPITAL ASSOCIATION, et al.,** ) | |
| ) | |
| **Plaintiffs** ) | |
| v. ) | NO. 3:16-cv-3263 |
| ) | CHIEF JUDGE CRENSHAW |
| **THOMAS PRICE, et al.,** ) | |
| ) | |
| **Defendants** ) | |

## MEMORANDUM OPINION

Pending before the Court are the following motions:

(1) Plaintiffs' Motion for Judicial Notice of Facts Not Subject to Reasonable Dispute (Doc. No. 61), which will be **GRANTED** as unopposed;[1]

(2) Plaintiffs' Motion for Summary Judgment (Doc. No. 62); and

(3) Defendants' Motion to Dismiss[2] or, in the Alternative, Cross Motion for Summary Judgment (Doc. No. 67).

## I. INTRODUCTION

Plaintiffs are the Tennessee Hospital Association and three of its hospital members, Takoma Regional Hospital, Delta Medical Center, and Parkwest Hospital. Defendants are Thomas Price, the Secretary of the United States Department of Health and Human Services ("HHS"); Seema Verma, Administrator of the Center for Medicare and Medicaid Services; and the Center

---

[1] These facts deal with documents on state and federal government websites.

[2] The parties rely on documents outside the pleadings. Accordingly, the Court treats the cross-motions as motions for summary judgment.

1

for Medicare and Medicaid ("CMS"), the federal agency that administers the Medicaid program. Price and Verma are sued in their official capacities only.[3]

Plaintiffs contend that Defendants have violated the Medicaid Act ("the Act"), 42 U.S.C. § 1396, *et seq.*, and the Administrative Procedures Act ("APA"), 5 U.S.C. § 500, *et seq.*, by instituting and enforcing Defendants' responses to certain Frequently Asked Questions ("FAQs") on their website and, as a result, Defendants have substantively amended the Medicaid statute and regulations without authority and without complying with the proper processes under the APA. Defendants maintain the FAQs are a reasonable interpretation of the Act entitled to deference.

## II. MEDICAID ACT AND REGULATIONS

Medicaid is a cooperative federal-state program through which the federal government provides financial assistance to the states so they may incentivize healthcare providers to furnish medical care to needy individuals. Wilder v. Virginia Hospital Ass'n, 496 U.S. 498, 502 (1990). Congress passed the Act in 1965 to provide medical services to those members of our society who, because they lack the necessary financial resources, cannot otherwise obtain medical care. 42 U.S.C. § 1396, et seq.

In 1981, Congress amended the Act to ensure that hospitals that serve a disproportionate number of low-income patients, known as disproportionate share hospitals ("DSH"), receive an appropriate increase in the amount of payment for healthcare services. 42 U.S.C. §1396r-4. The DSH program helps reimburse DSH hospitals, through payment adjustments, for the additional

---

[3] Price and Verma were not the originally named Defendants in this case (Doc. No. 1), but they took their respective offices during the course of the litigation and have been substituted as parties herein.

costs they incur providing eligible services to Medicaid and uninsured patients. These reimbursements, known as DSH payments, are supplements to the general funding that hospitals receive from their respective states through the Medicaid program. Id.

States are not required to participate in the Medicaid program, but those choosing to do so must comply with the Act and with regulations duly promulgated by the Secretary of HHS. Wilder, 496 U.S. at 502. Each state administers its own Medicaid program pursuant to a state plan.[4] If CMS approves a state's plan, the federal government provides federal financial participation ("FFP") to reimburse each state for a portion of the costs that the state incurs for Medicaid patient healthcare. 42 U.S.C. § 1396b. The remaining portion of a state's Medicaid expenditures is funded by the state. Id.

The statute at issue here provides, among other things, that DSH payments made to a hospital cannot exceed:

> the costs incurred during the year of furnishing hospital services (as determined by the Secretary and net of payments under this subchapter, other than under this section, and by uninsured patients) by the hospital to individuals who either are eligible for medical assistance under the State plan or have no health insurance (or other source of third party coverage) for services provided during the year.

42 U.S.C. § 1396r-4(g)(1)(A).

In order to ensure that the hospital-specific DSH payment limit has been calculated correctly for each DSH, the statute also provides that, as a condition of receiving DSH payments, a state must meet certain reporting and audit requirements to verify, among other things, that "[o]nly the uncompensated care costs of providing inpatient hospital and outpatient hospital

---

[4] Tennessee participates in the Medicaid program through its TennCare program.

services to individuals . . . are included in the calculation of the hospital-specific limits under [the statute]." 42 U.S.C. § 1396-4(j)(2)(C). This portion of the statute, captioned "Annual reports and other requirements requiring payment adjustments," sets forth reporting and auditing requirements for states participating in the Medicaid program, particularly in the DSH program. For example, Congress requires that each state provide to CMS an annual report and audit of its DSH program, including an independent certified audit for each DSH hospital. 42 U.S.C. § 1396r-4(j). Defendants promulgated regulations in 2008 interpreting these reporting and auditing requirements. 42 C.F.R. § 447.299. The 2008 regulations did not change the calculation of DSH payment limits as set forth in the statute. 42 C.F.R. § 447.299 and 42 U.S.C. § 1396r-4.

The regulation at issue here requires that states annually submit to Defendants certain information for each DSH hospital that has received a DSH payment. 42 C.F.R. § 447.299(c). States must submit, among other information, each DSH hospital's total annual uncompensated care costs. Congress defined "total annual uncompensated care costs" as:

> the total cost of care for furnishing inpatient hospital and outpatient hospital services to Medicaid eligible individuals and to individuals with no source of third party coverage for the hospital services they receive less the sum of regular Medicaid FFS[5] rate payments, Medicaid managed care organization payments, supplemental/ enhanced Medicaid payments, uninsured revenues, and Section 1011 payments for inpatient and outpatient hospital services.[6]

42 C.F.R. § 447.299(c)(16).

---

[5] "FFS" stands for "fee-for-service." 47 C.F.R. § 447.299(c)(6).

[6] These specifically named payments are also defined in § 447.299. None of them includes private insurance payments or Medicare payments, which Defendants attempt to add to the list created by Congress.

In early 2010, CMS posted a document on its website entitled "Additional Information on the DSH Reporting and Audit Requirements," which contained answers to FAQs about the federal audit and reporting requirements. Two of the responses to those FAQs, Nos. 33 and 34, are at issue in this litigation.

The FAQs and responses at issue state as follows:

33. Would days, costs, and revenues associated with patients that have both Medicaid and private insurance coverage (such as Blue Cross) also be included in the calculation of the MIUR[7] percentage and the DSH limit in the same way States include days, costs and revenues associated with individuals dually eligible for Medicaid and Medicare?

Days, costs, and revenues associated with patients that are dually eligible for Medicaid and private insurance should be included in the calculation of the Medicaid impatient utilization rate (MIUR) for the purposes of determining a hospital eligible for Medicaid and also enrolled in private health insurance. Section 1923(g)(1)[8] does not contain an exclusion for individuals eligible for Medicaid and also enrolled in private health insurance. Therefore, days, costs and revenues associated with patients that are eligible for Medicaid and also have private insurance should be included in the calculation of the hospital-specific DSH limit. As Medicaid should be the payer of last resort, hospitals should also offset both Medicaid and third-party revenue associated with the Medicaid eligible day against the costs for that day to determine any uncompensated amount.

34. The regulation states that costs for dual eligibles should be included in uncompensated care costs. Could you please explain further? Under what circumstances should we include Medicare payments?

Section 1923(g) of the Act defines hospital-specific limits on FFP[8] for Medicaid DSH payments. Under the hospital-specific limits, a hospital's DSH payment must not exceed the costs incurred by that hospital in furnishing services during the year to Medicaid and uninsured patients less payments received for those patients. There is no exclusion in section 1923(g)(1) for costs for, and payment made, on behalf of

---

[7] Medicaid Impatient Utilization Rate

[8] 42 U.S.C. § 1396r-4(g)(1)

[8] Federal financial participation

individuals dually-eligible for Medicare and Medicaid. Hospitals that include dually-eligible days to determine DSH qualification must also include the costs attributable to dual eligibles when calculating the uncompensated costs of serving Medicaid eligible individuals. Hospitals must also take into account payment made on behalf of the individual, including all Medicare and Medicaid payments made on behalf of dual eligibles. In calculating the Medicare payment for service, the hospital would have to include the Medicare DSH adjustment and any other Medicare payments (including, but not limited to Medicare IME and GME) with respect to that service. This would include payments for Medicare allowable bad debt attributable to dual eligibles.

(Doc. No. 1-2 at 19.)

Beginning with payments made in Fiscal Year 2011, if an audit reveals any DSH payments in excess of the hospital's DSH payment limit, those overpayments must be recovered by the state and returned to the federal government, unless they are redistributed by the state to other qualifying DSH hospitals. New Hampshire Hosp. Ass'n. v. Burwell, 2017 WL 822094 (D. N.H. Mar. 2, 2017) (citing 73 Fed. Reg. 77906). Any overpayments must be recouped by the state within one year of their discovery or the federal government may reduce its future contribution. Texas Children's Hosp. v. Burwell, 76 F.Supp.3d 224, 230 (D. D.C. 2014).

On April 3, 2017, Defendants published the final version of a rule that specifically incorporated the policies reflected in FAQs 33 and 34. The regulation now includes, in part, the following provision, effective June 2, 2017:

(10) Total Cost of Care for Medicaid IP/OP Services. The total annual costs incurred by each hospital for furnishing inpatient hospital and outpatient hospital services to Medicaid eligible individuals. The total annual costs are determined on a hospital-specific basis, not a service-specific basis. For purposes of this statute, costs -

(i) Are defined as costs net of third-party payments, including, but not limited to, payments by Medicare and private insurance.

42 U.S.C. § 447.299(c)(10).

III. PROCEDURAL HISTORY

This action was filed on December 15, 2016. The next day, Plaintiffs filed a Motion for Preliminary Injunction and for Stay under the Administrative Procedures Act. (Doc. No. 8.) On December 22, 2016, Plaintiffs filed an Amended Complaint (Doc. No. 16) and a Motion for Temporary Restraining Order and Amended Motion for Preliminary Injunction (Doc. No. 18.) The Amended Complaint (Doc. No. 16) asserts causes of action for: (Count I) violation of 5 U.S.C. § 706(2)(C) of the APA; (Count II) violation of 5 U.S.C. § 706(2)(A) and (D) of the APA; and (Count III) declaratory judgment that Defendants lack statutory authority to promulgate the 2016 proposed rule.

A hearing on Plaintiffs' motions for injunctive relief was held on December 30, 2016. (Doc. No. 19.) At that hearing, the Court requested additional information from the parties and continued the hearing until January 5, 2017. The Court also ordered Plaintiffs to give formal notice of the litigation to the Tennessee Attorney General. (Doc. No. 38.) Pursuant to notice from the parties, the hearing set for January 5, 2017, was canceled, and the case was referred to the Magistrate Judge for case management and to determine whether the motions for injunctive relief could be combined with cross motions for summary judgment. (Doc. No. 49.)

The Initial Case Management Order (Doc. No. 57) provides that Plaintiffs will file a combined motion for preliminary injunction and for summary judgment and Defendants will file a combined response in opposition thereto and their own motion to dismiss or for summary judgment. These motions are now fully briefed. The parties have agreed that Plaintiffs' claims turn solely on legal issues of statutory and regulatory interpretation, so that Plaintiffs' claims may be

resolved without reference to any administrative record. (Doc. No. 57.)[9]

On May 30, 2017, the Court held a hearing on whether to enter a status quo injunction until it rules on these cross-motions for summary judgment. The Court ordered that, pending its decision on the cross-motions for summary judgment, Defendants are enjoined from imposing or requiring the State of Tennessee to impose DSH recoupment payment requirements on the Plaintiffs' hospitals. (Doc. No. 82.)

### IV. STANDARD OF REVIEW

Because this is a lawsuit for review of an agency action under the APA, the case can and should be resolved on summary judgment. New Hampshire Hospital at * 1. In an APA action, summary judgment becomes the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record or otherwise consistent with the APA standard of review. Harkness v. Secretary of the Navy, 174 F.Supp.3d 990, 1004 (W.D. Tenn. 2016).

The usual rules governing summary judgment, however, do not apply. Integrity Gymnastics & Pure Power Cheerleading, LLC v. U. S. Citizenship and Immigration Servs., 131 F.Supp.3d 721, 725 (S. D. Ohio 2015). Instead, a district court's review is limited to whether the agency's action falls within certain categories enumerated in the statute. Id. Under the APA, a court must hold unlawful and set aside agency findings, and conclusions found to be:

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

---

[9] Similarly, the parties' Statements of Undisputed Facts are not necessary to the Court's decision, because only issues of law are posed.

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706(2).

Plaintiffs seek both declaratory and permanent injunctive relief. Federal law provides that, with certain exceptions not applicable here, any federal court, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether further relief is or could be sought. 28 U.S.C. § 2201(a).

## V. ANALYSIS

Although each of Plaintiffs' three causes of action in the Amended Complaint represents a separate challenge to Defendants' actions, all three challenge Defendants' enforcement of the policies set forth in the responses to FAQs 33 and 34 and allege violations of the APA. Count I alleges violation of Section 706(2)(C) of the APA[10] through the promulgation of FAQ responses that are contrary to the plain language of the statute. Count II alleges violation of Section 706(2)(A) and (D) of the APA[11] through the promulgation of FAQ responses that are contrary to the unambiguous language of the regulation and were not promulgated through the required notice-and-comment procedures. Count III seeks declaratory judgment that Defendants lack statutory

---

[10] A court must hold unlawful and set aside agency findings and conclusions that are found to be in excess of statutory jurisdiction or authority. 5 U.S.C. § 706(2)(C).

[11] A court must hold unlawful and set aside agency findings and conclusions that are found to be arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law or without observance of procedure required by law. 5 U.S.C. § 706(2)(A) and (D).

authority to promulgate the 2016 proposed rule that included language similar to that of the FAQ responses.

In December of 2016, each of the Plaintiffs received email notification from the State of Tennessee that their 2012 audits revealed DSH overpayments that must be repaid.[12] (Doc. No. 16 at ¶ 51.) In this lawsuit, Plaintiffs assert that those overpayments were incorrectly calculated by deducting private insurance and Medicare payments from each of their DSH payment limits.[13] Plaintiffs contend that, through the responses to FAQs 33 and 34, Defendants arbitrarily and unlawfully made substantive amendments to the Medicaid Act and regulations without congressional authority and without observance of the procedures required by law. Defendants, on the other hand, argue that the responses to FAQs 33 and 34 are merely clarifications to and reasonable interpretations of the statute and regulation.

Plaintiffs rely on the statutory language in 42 U.S.C. § 1396r-4(g)(1), and the words of the regulation, 42 C.F.R. § 447.299(c)(16), which Plaintiffs say unambiguously require only Medicaid payments to be subtracted from the calculation of the DSH payment limit. Defendants claim, however, that the same statute and regulation require the calculation of the DSH payment limit to subtract *all* compensation received on behalf of Medicaid patients, including private insurance payments and Medicare payments.

In order to determine whether Defendants' actions in enforcing the responses to FAQs 33 and 34 were in excess of their statutory and regulatory authority or otherwise violate the APA, the

---

[12] There is no dispute that Plaintiffs are eligible to receive DSH payments.

[13] If the FAQs are unenforceable as Plaintiffs contend, then the audit of fiscal year 2012, based on those FAQs, is not accurate. See New Hampshire Hospital at * 7.

Court must first determine whether the responses to FAQs 33 and 34 amended or merely interpreted or clarified the existing statute (42 U.S.C. § 1396r-4) and regulation (42 C.F.R. § 447.299). Recent decisions by two sister district courts are instructive.

The court in Texas Children's Hospital granted a preliminary injunction in a challenge to FAQ 33, finding, among other things, that the formula codified by the existing regulation did not contemplate the inclusion of private-insurance payments for Medicaid-eligible services. Texas Children's Hospital, 76 F.Supp.3d at 236-37, 247 (citing 42 C.F.R. § 447.299(c)(16)). The court reasoned that the regulation makes no mention of payments from private insurance for Medicaid-eligible patients. (Id.)

Similarly, the court in New Hampshire Hospital granted a permanent injunction, finding that the defendants violated the APA when they instituted the policies set forth in the responses to FAQs 33 and 34. New Hampshire Hospital at * 5. That court held that FAQs 33 and 34 expressed a new interpretation of the DSH limit calculation and, because the defendants tried to make this new interpretation through FAQs and not through the rule-making process, they acted in excess of their statutory jurisdiction and authority or short of statutory right, in violation of the APA. Id. at *12.

Finding that the response to FAQ 33 made a substantive change to the formula for calculating the hospital-specific limit in a manner not provided for by any prior rule or statutory source, the Texas Children's Hospital court held that it could have been promulgated only in accordance with the notice-and-comment provisions of the APA. Texas Children's Hospital, 76 F.Supp.3d at 241. Because the response to FAQ 33 was not subject to any notice-and-comment procedures, the court found that the plaintiffs were likely to succeed in arguing that FAQ 33 should

be set aside as unlawful. Id. Similarly, the court in New Hampshire Hospital held that because Defendants substantially altered existing rules, the policies expressed in the FAQs responses had to be promulgated using notice-and-comment rule-making under the APA, and they were not. New Hampshire Hospital at * 13.

The Court agrees with the courts in Texas Children's Hospital and New Hampshire Hospital. 42 U.S.C. § 1396r-4(g)(1)(A) clearly and unambiguously sets the DSH limit as costs incurred, net of payments under the Medicaid Act. See New Hampshire at * 2. The section does not say net of payments from private insurance and Medicare. It specifically states "net of payments under this subchapter, other than under this section, and by uninsured patients." 42 U.S.C. § 1396r-4(g)(1)(A).

In addition, the Court finds that the regulation clearly and unambiguously defines "total annual uncompensated care costs" as an enumerated set of costs minus an enumerated set of payments. See Texas Children's Hospital, 76 F.Supp.3d at 230. Those payments do not include the payments of private insurance or Medicare. Rather, the regulation specifically lists "regular Medicaid FFS rate payments, Medicaid managed care organization payments, supplemental/enhanced Medicaid payments, uninsured revenues, and Section 1101 payments for inpatient and outpatient services." 42 C.F.R. § 447.299(c)(16).

The responses to FAQs 33 and 34, on the other hand, provide that in calculating the hospital-specific DSH limit, a state must subtract payments received from both private health insurance and Medicare. These responses make a substantive change to existing law, not simply a clarification. These responses modify the formula for calculating the DSH limit in a manner not provided by any prior rule or statutory source. Texas Children's Hospital, 76 F.Supp.3d at 240.

12

The Court finds the clear language of the statute and regulation to be unambiguous, and the language of the FAQ responses to be substantially different.

Defendants argue that the words "uncompensated costs" in 42 U.S.C. § 1396r-4(j)(2)(C) should be interpreted to account for all revenue received from private payers on behalf of Medicaid-eligible patients because such revenue makes those costs *compensated*, not uncompensated. But Congress and the legally-promulgated regulation did not leave the word "uncompensated" unexplained or undefined. The statute and regulation are not silent about this issue; they include specific definitions of the calculation and "all relevant inputs," including total annual uncompensated care costs. Texas Children's Hospital, 76 F.Supp.3d at 236. In other words, there is no "gap" for the Secretary to fill with regard to this calculation. The statute specifies which payments to subtract, and the regulation specifically defines total uncompensated care costs.

Defendants also argue that the FAQ responses are merely a reasonable interpretation of the statute, entitled to deference under Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984). In Chevron, the Court held that if a statute is clear in its meaning, courts must give effect to the unambiguously expressed intent of Congress. Chevron, 467 U.S. at 842-43. If Congress' intent is unclear, then the court's inquiry focuses on whether the agency's answer is based on a permissible construction of the statute. Id. at 843.[14] Even if the FAQs were considered regulations, which they are not, Chevron deference is not warranted where a regulation is

---

[14] Recent cases from the Supreme Court have limited the applicability of Chevron to those cases in which Congress delegated authority to the agency generally to make rules carrying the force of law and the agency interpretation claiming deference was promulgated in the exercise of that authority. New Hampshire Hospital at * 9 (citing United States v. Mead Corp., 533 U.S. 218, 226-27 (2001)).

procedurally defective -- where, as here, the agency erred by failing to follow the correct procedures in issuing the regulation. Encinco Motorcars, LLC v. Navarro, 136 S.Ct. 2117, 2125 (2016).

Defendants maintain that Congress has directly spoken on the precise question at issue here through the language of the statute, Section 1396r-4(g)(1)(A), and that language is entitled to deference. The Court does not disagree. The language of the statute does *not* include private insurance payments or Medicaid payments.[15] If Defendants wanted to add those payments to the statutory calculation, Congress would have to amend the statute through the proper processes.[16] Posting responses to FAQs on Defendants' website is not legally sufficient, even if a handy device for the Defendants. As found in New Hampshire Hospital, the evidence shows the authority for the policies at issue here is the responses to the FAQs. Responses to FAQs do not carry the force of law and do not qualify for Chevron deference.

Even if Congress, through words like "as determined by the Secretary," provided an express delegation of authority to Defendants to elucidate this specific provision of the statute through regulation,[17] the FAQ responses were not promulgated in the exercise of that authority because they are not regulations. New Hampshire Hospital at * 9, 12. And even if the FAQ responses

---

[15] It states "net of payments under this subchapter, other than under this section, and by uninsured patients." 42 U.S.C. § 1396r-4(g)(1)(A).

[16] It is not the office of this Court to determine what the statute *should* say but what it *does* say.

[17] An agency's interpretation of its own regulations is entitled to deference under Auer v. Robbins, 519 U.S. 452, 461 (1997), unless it is plainly erroneous or inconsistent with the regulation. As explained herein, Defendants' interpretation of its 2008 regulation (42 C.F.R. § 447.299) in this case is both.

14

were interpreted as regulations, which they are not, they would still be unlawful because they were not promulgated through the required notice-and-comment process.[18]

Thus, the Court finds that Defendants' policies set forth in the responses to FAQs 33 and 34 violate the APA because they conflict with the unambiguous language of the Medicaid Act and the regulation quoted above.[19] In addition, the FAQ policies represent agency action that is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and without observance of procedure required by law because they were not promulgated pursuant to the required notice-and-comment rule-making procedures. 5 U.S.C. §§ 553 and 706. Accordingly, Plaintiffs' motion as to Counts I and II of the Amended Complaint will be granted.

In Count III, Plaintiffs ask the Court to declare that the proposed 2016 rule also violates the APA and is unlawful. The Court finds that Plaintiffs' claims with regard to the proposed 2016 rule are moot because that proposed rule has now become a final rule (the "2017 Rule"). 42 C.F.R. § 447.299(c)(10). A proposed rule is not a final agency action subject to judicial review. In re Murray Energy Corp., 788 F.3d 330, 334 (D.C. Cir. 2015); Nucor Steel-Ark. v. United States Environmental Protection Agency, 2016 WL 4055695 at * 2 (E.D. Ark. Apr. 13, 2016).

---

[18] The APA requires that in promulgating regulations, general notice of proposed rulemaking shall be published in the Federal Register and interested persons must be given an opportunity to participate in the rule making through submission of written data, views or arguments with or without opportunity for oral presentation. 5 U.S.C. § 553.

[19] Because the plain language of the statute itself supports the Court's ruling, the legislative history, the preamble to the regulation, and other extraneous documents discussed by the parties (which actually include language favoring both sides of this argument) do not change the ruling herein.

Plaintiffs argue that the Court should invalidate the 2017 Rule and enjoin it retroactively, but the 2017 Rule is not before the Court. It is not included in the Amended Complaint because it was not a final rule at the time of the Amended Complaint. Furthermore, the FAQ responses at issue here are not the same as the 2017 Rule promulgated through proper notice-and-comment procedures, and the audits at issue here predate 2017. Defendants have represented that the 2017 rule will have no retroactive effect. (Doc. No. 76 at 7.) Therefore, Plaintiffs' request for declaratory judgment (Count III) will be denied.

## VI. CONCLUSION

For the reasons expressed herein, Plaintiffs' Motion for Summary Judgment (Doc. No. 62) will be **GRANTED** as to Counts I and II and **DENIED** as to Count III. Defendants' Motion for Summary Judgment (Doc. No. 67) will be **DENIED** as to Counts I and II and **GRANTED** as to Count III.

An appropriate Order will be entered.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE